IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KIMBERLY STILES, | ) | CASE NO. 1:19-CV-2736 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Kimberly Stiles ("Stiles") seeks judicial review of the final decision of
Defendant Commissioner of Social Security ("Commissioner") denying her application for
Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C.
§ 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the
parties.  Doc. 12.

For the reasons explained below, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

Stiles filed an application for DIB in April 2016, alleging a disability onset date of
February 12, 2016.  Tr. 369.  She alleged disability based on the following: scoliosis, cervical
disc degeneration, unequal leg length, myalgia myositis, vitamin D deficiency, obstructive sleep
apnea, lateral epicondylitis of elbow, arthralgia, and osteoarthritis.  Tr. 388.  After denials by the
state agency initially (Tr. 200) and on reconsideration (Tr. 218), Stiles requested an
administrative hearing (Tr. 330).  A hearing was held before an Administrative Law Judge
("ALJ") on June 20, 2018.  Tr. 159-186.  In her October 19, 2018, decision, the ALJ determined
that Stiles can perform her past relevant work, i.e. she is not disabled.  Tr. 152.  Stiles requested

review of the ALJ's decision by the Appeals Council (Tr. 367) and, on October 15, 2019, the

Appeals Council denied review, making the ALJ's decision the final decision of the

Commissioner.  Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Stiles was born in 1962 and was 53 years old on the date she filed her application.  Tr.

369.  She completed the twelfth grate and last worked in 2016 as an administrative assistant.  Tr.

163-165.

### B. Relevant Medical Evidence

Physical impairments: On August 25, 2015, Stiles saw Dr. Levy, M.D., for persistent

swelling and drainage in her left ankle; she had had fusion surgery in it 10 to 15 years prior.  Tr.

507, 459.  She had also recently had ankle fusion surgery in her right ankle.  Tr. 842.  Upon

exam, she had a one-centimeter area of drainage on her left ankle and her gait was antalgic.  Tr.

508.  An x-ray showed that the fusion was solid.  Tr. 507.  It also showed chronic changes of the

distal tibia and ankle with ankylosis of the tibiotalar and subtalar joints and lower extremity

edema.  Tr. 458.  Dr. Levy's impression was ankle instability.  Tr. 508.

On September 16, 2015, Stiles returned to Dr. Levy for exploration, debridement and

biopsy of her left ankle.  Tr. 459.  On September 25, she had a follow up stating that she

remained concerned about persistent drainage.  Tr. 461.  Upon exam, she had some slight

separation near the original ulceration with moderate drainage.  Tr. 462.  Dr. Levy again

diagnosed ankle instability and prescribed antibiotics.  Tr. 462.

On October 7, 2015, Stiles returned with worsening drainage in her left ankle.  Tr. 467.

She reported that she could not wear shoes or walk much, it was excruciatingly painful, and she

had numbness and tingling.  Tr. 468.  Upon exam, the wound measured three centimeters long and one centimeter wide, with surrounding erythema.  Tr. 468.  She had diminished sensation laterally and hyperesthesias around the wound and tracking anteriorly.  Tr. 469.  She was referred for continued treatment to the wound care clinic.  Tr. 469.  A week later she reported having visited a provider at the wound clinic, who stopped her dressings and ordered an MRI. Tr. 470.  She described her pain as "severe and excruciating."  Tr. 470.  Upon exam, the wound showed some exudate in the base and healthy appearing granulations at the margins.  Tr. 471. She was diagnosed with ankle arthropathy and prescribed Percocet.  Tr. 471-472.

On November 3, 2015, Stiles followed up with Dr. Frey, DPM, at the wound care center for her left ankle.  Tr. 515.  Upon exam, the wound was showing some improvement in size and quality.  Tr. 515-516.  She reported experiencing deep bone pain.  Tr. 515-516.  She was instructed to follow up weekly for monitoring and possible surgical debridement.  Tr. 516.

On November 12, 2015, Stiles saw rheumatologist Dr. Desai for a follow up for joint pain Tr. 842.  She reported pain in her bilateral shoulders, arms, neck, and hands.  Tr. 842.  She wore thumb splints at work where she used her hands a lot typing and stapling.  Tr. 842.  She had had subacromial bursa injections in the past, which helped for four to five months, and requested injections again.  Tr. 842.  Upon exam, she had tenderness and decreased range of motion in her cervical spine and positive impingement sign and good range of motion in both shoulders.  Tr. 844.  Dr. Desai diagnosed bilateral subacromial bursitis, cervicalgia, and chronic pain, and gave her bilateral subacromial bursa injections.  Tr. 844.

On December 14, 2015, Dr. Frey performed an "incision and drainage of the left lateral ankle" with grafting and scar revision.  Tr. 603-604.

On January 26, 2016, Stiles followed up with Dr. Frey for her left ankle wound.  Tr. 593.

3

She had been prescribed a wound vac to assist with wound care at home and Dr. Frey noted that the wound "continues to improve in overall size as well as quality of the wound." Tr. 593-594. On February 2, 2016, Stiles returned complaining of increased pain, which, Dr. Frey remarked, "appeared to be neurological in her mind." Tr. 585.  He commented that the wound continued to improve and prescribed pain medication. Tr. 585-586.  On February 16, Stiles reported that her pain was well controlled and Dr. Frey remarked that her wound continued to improve "greatly." Tr. 732.  On February 23, Stiles reported having experienced some discomfort the past week; she also admitted to non-compliance with her wound care regimen, traveling to Pittsburgh on a regular basis for a family matter, and walking up to ten miles a day during those visits.  Tr. 734.

Meanwhile, on February 1, 2016, Stiles saw Elizabeth Habjan, D.O., regarding her ongoing problems with pain.  Tr. 741-742.  Upon exam, Stiles had a normal affect, was fully oriented, and in no distress.  Tr. 741-742.  She had no edema or tenderness, no acute inflammation, normal muscle tone, and Dr. Habjan remarked that she had "moderate" degenerative disease.  Tr. 742.

On May 12, 2016, Stiles returned to Dr. Desai for a follow up of joint pain and osteoarthritis.  Tr. 850.  She reported severe thumb pain, right greater than left, that made it hard to perform her activities of daily living.  Tr. 850.  An x-ray of her right wrist from 2014 showed degenerative arthritis of her first CMC joint and arthritis in her wrist.  Tr. 851.  Upon exam, her neurological functioning was grossly intact and she had no evidence of synovitis in her elbows, wrists, hands, or knees.  Tr. 851-852.  She had a restricted range of motion in her cervical spine and a good range of motion in her shoulders and hips.  Tr. 851-852.  Dr. Desai assessed severe thumb osteoarthritis in both hands, left greater than right; prescribed Gabapentin, Voltaren gel, and a thumb splint; injected her right thumb with Depomedrol; and referred her to hand

orthopedics and a pain management consultation. Tr. 852-853.

On June 1, 2016, Stiles returned to Dr. Levy complaining of pain in her lower back, hands, and left ankle. Tr. 1326. She denied experiencing anxiety, depression, joint swelling, weakness, numbness, tingling, and loss of balance. Tr. 1327-1328. Upon exam, she had an abnormal gait, her wound had healed, and she had no gross deformity or pain with palpation in her left foot/ankle. Tr. 1328. Dr. Levy's impression was a lumbar sprain and he prescribed medication. Tr. 1328.

On June 17, 2016, Stiles visited pain management physician Dr. Abdelmalak, M.D., and had 14 tender trigger points throughout her body, a normal gait, full strength, intact sensation and reflexes, and a normal mental status finding. Tr. 812, 815-816. She was diagnosed with fibromyalgia and advised to continue her medications, do aquatherapy, and participate in a chronic pain rehabilitation program. Tr. 815-816.

On June 29, 2016, Stiles saw Dr. Hendrickson, M.D., with concerns for her thumb arthritis and de Quervian's.[1] Tr. 860-861. Upon exam, she had good motor and sensory function and "no significant findings" in her thumb and finger joints. Tr. 860. Dr. Hendrickson diagnosed primary osteoarthritis of both first carpometacarpal joints, primary osteoarthritis of both hands, and de Quervain's tendonitis, and advised full time splinting and occupational therapy. Tr. 862. Stiles was fitted for splints the same day by an occupational therapist, who found that her range of motion, dexterity, coordination, and ability to make a fist and extend her fingers were all intact, with pain upon dexterity/coordination and moderate edema in both wrists/thumbs. Tr. 983-984.

---

[1] De Quervain's tenosynovitis is a painful condition affecting the tendons on the thumb side of the wrist. *See* https://www.mayoclinic.org/diseases-conditions/de-quervains-tenosynovitis/symptoms-causes/syc-20371332 (last visited 11/23/2020)

On August 24, 2016, Stiles saw Dr. Hendrickson with worsening thumb pain, left more than right.  Tr. 910.  Dr. Hendrickson ordered a CT scan of her left hand, which showed marked narrowing with subchondral cystic changes in the osteophytes of the first CMC joint with radial subluxation of the first metacarpal and mild degenerative changes.  Tr. 910, 916.

On March 20, 2017, Stiles went to the emergency room for low back pain on her left side that radiated down her leg into her foot.  Tr. 1032.  It started one month prior and had gradually gotten worse.  Tr. 1032.  She reported having gone to Pittsburgh over the weekend and her pain had gotten much worse when she was walking around.  Tr. 1032.  She was walking with a cane. Tr. 1032.  Medication had not helped and she had not tried heat or ice.  Tr. 1032.  Upon exam, she appeared alert and oriented and in no apparent distress.  Tr. 1033.  She had 5/5 strength, intact sensation, and negative, but painful, straight leg raise testing.  Tr. 1033.  She was diagnosed with sciatic and discharged.  Tr. 1033.  Subsequently, an x-ray of her lumbar spine showed moderate multilevel degenerative disc disease; severe multilevel facet arthropathy; and grade 1 anterlisthesis at L4-5 (new compared to her 2014 x-ray).  Tr. 1035.  An MRI showed slight bulging at T12-L2; hypertrophic changes at L2-3; slight retrolisthesis and bulging, with slight canal and mild bilateral foraminal stenosis at L3-4; slight anterior spondylolisthesis and bulging at L4-5, with impingement on the thecal sac and mild left sided foraminal stenosis; and grade 1 retrolisthesis with small left central herniation at L5-S1.  Tr. 1025-1026.  X-rays of her hips showed minimal narrowing of her bilateral hip joints and no evidence of fracture or destructive lesion.  Tr. 1248.  X-rays of her knees showed evidence of her left knee replacement (with no evidence of hardware loosening) and mild degenerative changes in her right knee.  Tr. 1252.

On March 30, 2017, Stiles saw Dr. McLain, M.D., upon referral from Dr. Levy, about her

radical low back pain.  Tr. 1354.  Upon exam, she was in obvious distress and sat flexed forward.  Tr. 1356.  She moved with difficulty around the room with a cane.  Tr. 1356.  She had full range of motion throughout her extremities and no evidence of atrophy, significant paraspinal tenderness but no spasms, marked pain with back range of motion, and limited strength due to pain.  Tr. 1356.  Dr. McLain reviewed her recent lumbar MRI and diagnosed a synovial cyst of the lumbar facet joint and recommended surgery.  Tr. 1356-1357.  Dr. McLain performed this surgery, a lumbar L4-5 hemilaminectomy with facetectomy and nerve root decompression, on April 4, 2017.  Tr. 1045-1046.

On May 18, 2017, Stiles had a 6-week post-op visit with Dr. McLain and reported that the surgery entirely resolved her radicular symptoms.  Tr. 1461.  She had minimal back pain and was back to functioning at a reasonably normal level, she was not taking any medication for her back pain, was ready to start physical therapy, and overall she was "very happy" with the results of the procedure and "has had an excellent outcome."  Tr. 1461.

On May 22, 2017, Stiles saw Dr. Levy for a follow up and reported doing "okay"; her radicular symptoms were gone but she was still having low back pain.  Tr. 1293.

In June 2017, Stiles had an x-ray of her left foot, which found solid fusion of the left ankle and slight progression of degenerative changes.  Tr. 1288.

In August 2017, Stiles visited Dr. Levy complaining of right knee pain.  Tr. 1283.  An x-ray of her right knee showed degenerative changes.  Tr. 1287.  She was found to walk with a limp.  Tr. 1280.  She continued to complain of right knee pain and received injections.  Tr. 1283-1285, 1267-1269.

An August 2017 MRI of Stiles's lumbar spine was compared to her pre-surgical MRI taken in April and showed no significant changes, other than the surgical site, which showed

mild enhancement of the soft tissue along the laminectomy defect and thecal sac consistent with scar tissue, slight retrolisthesis, and mild disc bulging and hypertrophy and synovial effusions at the facet joints at L5-S1.  Tr. 1275-1277.

In September 2017, Stiles was diagnosed with breast cancer and underwent chemotherapy, then radiation.  Tr. 1429-1430, 1477.

In a January 2018 visit with Dr. Levy, Stiles reported right knee and hip pain and that she had obtained "great relief from the last injections."  Tr. 1472.  Upon exam, she walked with a limp and appeared very uncomfortable.  Tr. 1474.  Dr. Levy gave her injections in her right knee and the right side of her lumbar trigger.  Tr. 1475.

At a March 2018 visit with her treating oncologist, Stiles had a normal appearance, cognition, gait, and range of motion, and had no focal neurological deficits.  Tr. 1441.

Mental impairments: On July 27, 2017, Stiles began mental health treatment at Signature Health.  Tr. 1114.  She reported a lack of interest, difficulty concentrating, feeling down and depressed, and panic attacks.  Tr. 1121.  Upon exam, she was cooperative, friendly, fully oriented, had good hygiene and eye contact, normal speech and language, average intellectual functioning, coherent and logical thought processes, normal thought content, intact memory, and intact judgment and insight.  Tr. 1118-1119.  She was currently taking Cymbalta and Wellbutrin. Tr. 1121.  She was diagnosed with anxiety and depressive disorder.  Tr. 1115.

On August 1, 2017, Stiles saw licensed social worker Ms. Verde for individual counseling.  Tr. 1074-1078.  Verde commented that she engaged readily and openly and was tearful the first part of her session.  Tr. 1077.  Stiles described experiencing physical pain for the last 30 years, recent losses, and that she had been struggling daily to get out of bed and had gone three days without showering or changing clothes, which was unusual for her.  Tr. 1077.  Stiles

continued to attend counseling with Verde about every two weeks, Tr. 1086, 1090, 1098, and saw her about once a week during the time she was receiving chemotherapy treatments. *See, e.g.*, Tr. 1150, 1156, 1526, 1531.

In November 2017, Stiles reported becoming more phobic about leaving the house and expressed concern about getting sick around other people.  Tr. 1161.  She stated that she had always been "germaphobic" but that it was getting worse; Verde responded that some of her feelings were normal given the fact that she was receiving treatment for her cancer.  Tr. 1161.

Stiles also regularly saw nurse practitioner Ms. Turoczi at Signature Health for medication management.  Tr. 1126-1128.  Stiles regularly had the following findings during her examinations: full orientation, a sad or depressed mood, and normal hygiene, eye contact, attitude, attention, concentration, speech, language, thought processes, thought content, fund of knowledge, memory, judgment, and insight.  Tr. 1124, 1131, 1182-1183, 1190-1191, 1417-1148, 1424-1425, 1539-1540.

On February 17, 2018, Stiles saw Turoczi and her current diagnoses were listed as major depressive disorder, single episode, severe; and generalized social phobia.  Tr. 1415, 1419.  She was having difficulty sleeping and needed a new CPAP machine and she was feeling more isolated.  Tr. 1420.  Turoczi assessed her with anxiety and depression exacerbated by recent diagnosis of breast cancer, chemotherapy treatment, social stressors, death in the family, and ongoing bouts of physical pain due to fibromyalgia.  Tr. 1420.  She assessed her as stable on medications, adjusted some medications to address her difficulty sleeping, and recommended daily walking and a sleep study/evaluation for a CPAP machine.  Tr. 1420.

On May 15, 2018, Turoczi wrote that Stiles had finished her chemotherapy and radiation and was in better spirits and her sleep had improved.  Tr. 1541.  Turoczi remarked that, overall,

Stiles had improved and was stable on her medications.  Tr. 1542.

### C. Opinion Evidence

#### 1. Treating Source

Physical: On September 16, 2016, Dr. Hendrickson saw Stiles and completed a
questionnaire.  Tr. 1004-1006.  He listed her diagnoses: osteoarthritis and De Quervain's
tenosynovitis of the carpometacarpal joints.  Tr. 1004.  His examination was significant for
thumb base pain, crepitus, and tenderness primarily at the carpometacarpal joints.  Tr. 1006.  He
assessed a "15 pound weight restriction."  Tr. 1005, 1006.

On January 29, 2018, Dr. Levy completed a medical source statement on behalf of Stiles.
Tr. 1246-1247.  He opined that Stiles was limited to lifting 20 pounds occasionally and 10
pounds frequently, had push/pull and manipulation limitations, and could sit for no more than 4
hours total in an 8-hour workday, one hour at a time, all due to lumbar back pain and
radiculopathy.  Tr. 1246-1247.  She could stand/walk for up to two hours total in an 8-hour
workday, 30 minutes at a time, due to her ankle fusions.  Tr. 1246.  She could rarely perform
postural activities other than balancing, which she could do occasionally, due to osteoarthritis in
her knees.  Tr. 1246.  She would require a sit/stand option and one hour of additional rest time
per day due to her severe pain.  Tr. 1247.  Dr. Levy stated that Stiles's multiple injuries and
multiple surgeries caused her constant pain and limited her mobility.  Tr. 1247.

Mental: On April 17, 2018, nurse practitioner Turoczi saw Stiles and completed a
medical source statement on her behalf.  Tr. 1422, 1451-1452.  She opined that Stiles had "none"
or "mild" limitations in her ability to understand, remember and apply information and to
interact with others.  Tr. 1451.  She opined that Stiles had none or mild limitations in most of the
activities listed in the categories under concentrate, persist or maintain pace and adapt or manage

oneself, and marked to extreme limitations in her ability to sustain an ordinary routine, maintain

regular work attendance, and to work a full day without excessive breaks.  Tr. 1452.  In support,

Turoczi cited Stiles's diagnoses of major depressive disorder and social phobia.  Tr. 1452.

Turoczi further stated that Stiles was unable to work due to her mental health conditions, which

were exacerbated by illness and side effects from her current medications.  Tr. 1452.

### 2. Consultative Examiner

Physical: On November 17, 2016, Stiles saw Dr. Sioson, M.D., for a consultative exam.

Tr. 1007-1008.  She reported neck and back pain radiating into her extremities.  Tr. 1007.  She

stated that she could drive, attend to her personal care, perform "limited" laundry, vacuum,

perform light cleaning and prepare simple meals, wash dishes, shop for groceries, and use her

hands to button, tie, and grasp.  Tr. 1007.  She cited a 15-year history of depression but stated

that her medications helped some.  Tr. 1007.  Upon exam, she walked with a waddling gait

without an assistive device, she could get up and down from the exam table, had knee and

shoulder pain with range of motion, marked neck and back tenderness, and eight tender points.

Tr. 1008.  She had negative straight leg raise testing and no swelling, redness, or gross deformity

in her joints; 5/5 or 4/5 strength throughout her extremities; and no muscle atrophy.  Tr. 1008-

1009.  She was able to manipulate with each hand, write, put pill containers in a plastic bag, take

her braces and shoes on and off, and handle various items such as a clipboard, papers, and her

purse.  Tr. 1008.  She was alert, coherent, cooperative, and oriented, with no abnormal behavior

or appearance.  Tr. 1008.  Dr. Sioson opined that Stiles would be limited to sedentary work and

"probably retains[s] ability to do light handling and manipulation."  Tr. 1008.

Mental: On May 24, 2016, Stiles saw Dr. Pickholtz, Ed.D., for a consultative

psychological examination.  Tr. 795-802.  When asked why she was unable to work, Stiles cited

pain everywhere, ankle fusions, and fibromyalgia. Tr. 796. She reported experiencing some levels of depression since she was 30 years old. Tr. 797. She was not receiving any counseling. Tr. 797. She had been taking psychiatric medications obtained from her primary care physician for the past five years and experienced "minimal" affective symptoms with her psychiatric medications. Tr. 797. Currently, she experienced mild depressive symptoms twice a week lasting 18 hours per occurrence. Tr. 797. She associated her depression with not working and pain. Tr. 797. She also reported mild levels of anxiety that occurred once a week and lasted 120 minutes, associated with worry about her health, money, family, and fear of germs. Tr. 797. She reported no history of inpatient psychiatric treatment or delusions, hallucinations, or post-traumatic stress symptoms. Tr. 797. She stated that she had always gotten along well with people in her neighborhood and community. Tr. 798. She was able to attend to her personal care, care for her great niece and nephew (5 and 7 years old) once a week for a few hours, wash laundry and dishes, vacuum, mop, sweep, run errands, read, check email and Facebook, talk on the phone daily, and regularly socialize with friends and family. Tr. 800-801. Upon exam, Stiles exhibited no signs of agitation, hostility, emotional lability, or autonomic anxiety; she understood and answered questions without difficulty; and maintained appropriate eye contact. Tr. 799. Her overall affect was "just a little bit constricted" and her mood was slightly depressed. Tr. 799. Her verbalizations were logical, coherent, relevant, and goal directed. Tr. 799. Her recall, attention, concentration, intellectual functioning, ability to perform arithmetic, ability to define words, and abstract thinking were all average. Tr. 800-801. Her pace, persistence, ability to recall a sequence of numbers, and recall long-term history were in the low average range. Tr. 797, 800. Dr. Pickholtz concluded that Stiles had no impairment or "slight impairment at worst" in her ability to understand, remember, and carry out instructions, maintain

attention and concentration, maintain persistence and pace to perform simple and multi-step tasks, respond to supervision and coworkers in a work setting, and respond to work pressures in a work setting.  Tr. 802.

### 3. State Agency Reviewers

Physical: On June 12, 2016, state agency reviewing physician Dr. Bolz, M.D., reviewed Stiles's record and opined that she was capable of lifting 20 pounds occasionally and 10 pounds frequently; standing and walking for a total of 3 hours; sitting for a total of 6 hours in an 8-hour workday; could not use her left leg for foot controls; could perform frequent bilateral handling and fingering; and had postural limitations.  Tr. 194-197.

On November 22, 2016, Dr. Southerland, M.D., agreed with Dr. Bolz's opinion but further limited Stiles to 2 hours standing and walking.  Tr. 212-214.

Mental: On June 9, 2016, Dr. Zeune, Psy.D., reviewed Stiles's record and opined that she had no more than mild mental limitations and, thus, her mental impairments were non-severe. Tr. 192-193.  In support of her conclusions, Dr. Zeune observed that Stiles had attributed her inability to work to her physical conditions; her consultative examination findings were within normal limits; and Stiles admitted that medications relieved her psychiatric symptoms.  Tr. 192.

On October 14, 2016, Dr. Murry-Hoffman, Ph.D., agreed with Dr. Zeune's conclusions. Tr. 209-210.

### D. Testimonial Evidence

#### 1. Stiles's Testimony

Stiles was represented by counsel and testified at the administrative hearing.  Tr. 161. She appeared with a cane and stated that she had had the cane for probably 20-25 years and used it when necessary; the weather the day of the hearing had "put her over the edge."  Tr. 165.  She

explained that she has arthritis in her whole body and the rain and moisture makes her body hurt. Tr. 165.  She believed that the cane initially had been prescribed to her by her orthopedic doctor after her ankle injuries.  Tr. 165-166.  She keeps it in her car and uses it regularly, depending on the weather: sometimes daily and sometimes less than every week.  Tr. 166.

Stiles is able to drive and goes places by herself.  Tr. 167.  She lives by herself.  Tr. 167. For the last five years she has paid someone to perform major household cleaning and her sister helps out too.  Tr. 167.  Her ankles hurt too bad to vacuum the three or four rooms in her small house and she can't kneel on the floor to clean.  Tr. 167.  She does laundry once a week and cooks, although she does not cook much.  Tr. 167.  On days that she does not go to the doctor she sleeps pretty late.  Tr. 167.  She doesn't watch television because she can't concentrate on a half-hour show, but she reads or plays games and checks social media on her tablet.  Tr. 167-168.

Stiles explained that she stopped working in 2016 because she had a hole in her left ankle that would not heal.  Tr. 170.  She was missing a lot of work and she could not walk.  Tr. 170. She would miss a few days in a row after she would go in to have her wound scraped.  Tr. 170-171.  This went on for months; finally, her employer confronted her and said that they needed someone who could work full time.  Tr. 171.  She had also had fusion surgery in her right ankle. Tr. 171.  She had problems with her hands and she would leave work to get hand injections.  Tr. 171.  She has arthritis in both hands and her thumb joints are "completely shot."  Tr. 172.  Due to her hand problems, she cannot write well with a pen and can't really type on a keyboard.  Tr. 172.  She can't open jars and can barely open water bottles.  Tr. 172.  She wears slip-on shoes and she does "limited buttons" because some days she can't button at all.  Tr. 172.  Her hands hurt all the time and sometimes she drops things.  Tr. 172.  Her hands have hurt for years and

14

have gotten worse over time.  Tr. 173.

Stiles stated that she has pain in both feet, right hip, and low back.  Tr. 174.  Her left knee was replaced so she doesn't have pain in it too much and she gets injections in her right knee; she will probably need a right knee replacement, too.  Tr. 174.  She was diagnosed with fibromyalgia about four years prior to the hearing.  Tr. 174.  She had back surgery about a year after she stopped working; "I just woke up one day and couldn't walk" and she had pain going down her right leg.  Tr. 174.  She went to the doctor, had imaging done, and subsequently had lumbar surgery.  Tr. 174-175.  She improved after the surgery such that she could walk without pain down her right leg.  Tr. 175.  She has a lot of back pain due to scoliosis and spondylosis.  Tr. 175.  She also experiences neck pain where she can't turn her head to the left at all.  Tr. 175.  She was diagnosed with breast cancer, received chemotherapy, and still receives IV treatment every three weeks.  Tr. 175-176.

When asked whether she could have continued to perform her office job had she not been let go, Stiles responded that she could not.  Tr. 176.  When asked what about the job would make it difficult for her to perform it, Stiles responded that the typing is the worst part, her hands would ache so bad.  Tr. 176.  And she cannot hold her head up for that length of time during the day.  Tr. 176.  For the last 25, 30 years she has elevated her legs to stop them from swelling.  Tr. 177.  She lies on a recliner or uses pillows if she is in bed.  Tr. 177.  When she worked she used boxes under her desk to elevate her legs.  Tr. 177.  She has problems sitting for long periods of time due to her hips and back and ankles swelling.  Tr. 177-178.  She can sit for less than an hour before she has to get up.  Tr. 178.

Stiles also testified that she has been going weekly for mental health treatment for the past year.  Tr. 179.  When asked how her mental health impairments would affect her ability to

work, Stiles stated that her medications cause her to have difficulty waking up in the mornings. Tr. 179. She has problems concentrating; she'll watch a 30-minute news program and not recall what she watched. Tr. 179. She uses her tablet for about 20 minutes at a time. Tr. 179.

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. Tr. 181-182. The ALJ discussed with the VE Stiles's past work history as an administrative assistant. Tr. 180-181. The ALJ asked the VE to determine whether a hypothetical individual of Stiles's age, education and work experience could perform her past work if that person had the limitations subsequently assessed in the ALJ's RFC determination, which are set forth below, and the VE answered that such an individual could perform Stiles's past work. Tr. 181-182.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.      If claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her October 16, 2018, decision, the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.  Tr. 144.

2.  The claimant has not engaged in substantial gainful activity since February 12, 2016, the alleged onset date.  Tr. 144.

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq*.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

3.  The claimant has the following severe impairments: degenerative disc disease of the cervical and lumber spine; osteoarthritis of the ankles, feet, and hands; fibromyalgia; and obesity.  Tr. 144.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals any listed impairment in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 146.

5.  The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except for the following limitations.  The claimant can stand and walk only two hours total during an eight-hour workday, and can sit for six hours of an eight-hour workday.  The claimant can reach overhead with the bilateral upper extremities frequently.  The claimant can handle or finger with the bilateral upper extremities frequently.  The claimant can occasionally climb ramps or stairs, but never ladders, ropes, or scaffolds.  The claimant can never kneel or crawl.  The claimant can frequently balance or stoop, and can occasionally crouch.  The claimant must avoid all exposure to hazards such as industrial machinery, unprotected heights, and commercial driving.  Tr. 147.

6.  The claimant is capable of performing past relevant work as an office administrator. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.  Tr. 152.

7.  The claimant has not been under a disability, as defined in the Social Security Act, from February 12, 2016, through the date of this decision.  Tr. 152.

## V. Plaintiff's Arguments

Stiles argues that the ALJ erred when she did not find Stiles's depression and anxiety to be a severe impairment, failed to incorporate related limitations in her RFC assessment, and erred when relying upon opinion evidence.  Stiles also asserts that new and material evidence warrants a remand.  Doc. 15, p. 13.

## VI. Law and Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err with respect to Stiles's mental limitations

Stiles argues that the ALJ erred when she found that Stiles's depression and anxiety were non-severe impairments at step two.  Doc. 15, p. 13.  And because the ALJ did not include mental limitations in her RFC assessment, Stiles asserts, the ALJ's error is not harmless.  Doc. 15, p. 16.

Step two is a *de minimis* hurdle such that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  When an ALJ finds both severe and non-severe impairments at step two and continues with subsequent steps in the sequential evaluation process, error, if any, at step two may not warrant reversal.  *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the failure to find an impairment severe at step two is not reversible error when the ALJ continues through the remaining steps of the evaluation and can consider non-severe impairments when assessing an RFC); *Anthony v. Astrue*, 266 Fed. App'x 451, 457 (6th Cir. 2008); *Hedges v. Comm'r of Soc. Sec.*, 725 Fed. App'x 394, 395 (6th Cir. 2018) ("So whether the ALJ characterized Hedges' mental-health impairments as severe or non-severe at step two is 'legally irrelevant' and does not amount to error.").

Here, the ALJ did not find Stiles's mental impairments severe at step two.  However, because the ALJ continued through the remaining steps of the evaluation, the ALJ's failure to find Stiles's mental health impairment severe at step two is not reversible error.  *Id*.

The ALJ discussed Stiles's depressive and anxiety disorders.  Tr. 145-146.  The ALJ discussed the four areas of functioning and found that Stiles had no or mild limitations in those areas.  In understanding, remembering, or applying information, the ALJ found that Stiles had no limitations, explaining that she had a long history of skilled work without difficulty with comprehension or memory; she stopped working due to physical health reasons, rather than any mental symptoms; and that the consultative examiner, Dr. Pickholtz, found no limitations in this area.  Tr. 145.  In interacting with others, the ALJ found that Stiles had no limitations: she never alleged any difficulty getting along with others in her past work; she continued to engage with family, friends, and medical providers on a regular basis; and she is able to leave home without exacerbating her symptoms.  The ALJ acknowledged that treatment notes for Signature Health revealed that Stiles had some significant stressors, but that the weight of the evidence, including Dr. Pickholtz's opinion, supporting a finding that she had no significant limitations.  Tr. 145.

In Stiles's ability to concentrate, persist, or maintain pace, the ALJ found that Stiles had a mild limitation.  She acknowledged that Stiles reported difficulty in this area due to her inability to watch a long television show, but there was no evidence that Stiles had difficulty in this area during her long work history which ended due to physical reasons.  The ALJ observed that mental status examinations generally did not reveal significant deficits in this area and that she presented with average attention and concentration during her consultative exam, despite subject reports of difficulty in that area.  Tr. 145.  And, with respect to adapting and managing oneself, the ALJ found that Stiles had a mild limitation.  The ALJ recognized that Stiles reported

significant difficulty tolerating stress without increasing her anxiety symptoms, but observed that, despite this allegation, the evidence showed no significant change in her ability to carry out the mental demands of her activities of daily living and managing her finances and medical care, driving, and tolerating her stressors.  The ALJ commented that Dr. Pickholtz opined that she had no more than a slight limitation in this area based on her presentation at the exam.  Tr. 145-146.

Lastly, the ALJ remarked that he gave great weight to Dr. Pickholtz's opinion (finding no or, at worst, slight impairment in her ability function in all areas, Tr. 802) and the state agency reviewers' opinions (finding Stiles's mental impairments non-severe, Tr. 192-194, 209-211). The ALJ discussed Nurse Practitioner Turoczi's checklist form but stated that the evidence did not show that Stiles's mental limitations materially changed from before she began routine, conservative treatment at Signature Health until after she began treatment, despite experiencing increased symptoms due to situational stressors after beginning treatment.  Tr. 146.

Stiles emphasizes that she was diagnosed with major depressive disorder, severe, and generalized social phobia.  Doc. 15, p. 14.  But the ALJ acknowledged her depressive disorder and anxiety disorder; a diagnosis, alone, "says nothing about the severity of the condition." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).  Stiles asserts that treatment notes showed "increased depression and fleeting thoughts of suicide (Tr. 1126), increased anxiety symptoms (Tr. 1161), the inability to leave her house (Tr. 1414), struggling to get out of bed and not wanting to shower or dress (Tr. 1077), and difficulty sleeping (Tr. 1420)" and that, "despite weekly counseling and medication adjustments, Ms. Stiles's symptoms persisted (Tr. 1427)." Doc. 15, p. 14.  However, the treatment notes Stiles cites were made when she was experiencing situational stressors such as unemployment and a cancer diagnosis/treatment, as the ALJ observed.  Tr. 146; Tr. 1077 (loss of job); Tr. 1126, 1161, 1414, 1420, 1427 (cancer diagnosis

and treatment).  The more recent notes also indicate that she was found to be stable on medication.  Tr. 1420, 1427.  Stiles argues that the cause of her symptoms "does not alleviate the ALJ from her duty to properly evaluate all the evidence and consider all resulting limitations in her assessment of Plaintiff's residual functional capacity."  Doc. 15, p. 15.  But Stiles's cancer diagnosis and treatment was temporary, as the ALJ observed (Tr. 144); thus, her mental health symptoms related to the same are accurately classified as a situational stressor.

Next, Stiles asserts that the ALJ erred "by not specifically addressing any of the treatment provided by Turoczi and therapist [] Verdi."  Doc. 15, p. 14.  But the ALJ remarked that Stiles received routine counseling and medication at Signature Health—the precise treatment provided by Turoczi and Verdi.  Tr. 146.  Stiles criticizes the ALJ for relying on the opinion provided by consultative examiner Dr. Pickholtz when Dr. Pickholtz's opinion "stems from a time period irrelevant to the more modern issues of Plaintiff" as it occurred more than a year before Stiles started mental health treatment.  Doc. 15, p. 14.  Stiles does not identify what "modern issues" she is referring to.  Furthermore, this argument is unavailing, as Dr. Pickholtz assessed Stiles after her alleged onset date; therefore, it cannot be said that this time period is "irrelevant."

Stiles argues that the ALJ ignored the fact that Turoczi provided ongoing treatment and that Dr. Pickholtz completed a one-time examination.  Doc. 15, p. 15.  However, the ALJ acknowledged that Dr. Pickholtz was a consultative examiner and that Turoczi was her "prescribing nurse practitioner" at Signature Health, where Stiles received routine treatment.  Tr. 145-146.  Stiles submits that the ALJ erred because she did not address Stiles's mental limitations in her RFC assessment, but the ALJ's failure to do so is not error.  *See Winters v. Berryhill*, No. 3:17CV1102, 2018 WL 4104185, at *6 (N.D. Ohio Aug. 29, 2018) (rejecting the claimant's argument the ALJ did not consider her depression and anxiety beyond step two of the

22

sequential evaluation or mention those impairments anywhere else in the decision, explaining, "Plaintiff fails to cite legal precedent requiring the ALJ to repeatedly state that the mental impairments, namely depression and anxiety, were considered throughout the decision.").

Finally, Stiles contends that the ALJ erred because she did not include any limitation in her RFC assessment resulting from Stiles's mental health impairments.  Doc. 15, p. 17.  But the ALJ was not required to include mental health limitations because she did not find that Stiles's symptoms caused any limitations.  Indeed, Stiles does not state what limitations she believes the ALJ should have included in the RFC assessment.  Although she points out that she testified at the hearing that she has difficulty concentrating for more than 20 to 30 minutes at a time, the ALJ remarked that there was no evidence she had problems concentrating when performing her prior job, exam findings generally did not show significant deficits concentrating, and she was found during her consultative exam to have average attention and concentration.  Tr. 145.  The ALJ also (later in her decision) remarked that, despite Stiles's testimony that she did not watch much television because she could not concentrate, she read and used a tablet to play games and use social media.  Tr. 148.  The ALJ also cited a treatment note from Signature Health in support of her finding that Stiles's reports to treating sources was inconsistent with allegations of disabling symptoms, remarking that Stiles was able to and did care for a terminally ill friend in Pittsburgh until her friend's passing in mid-2017.  Tr. 150.

In sum, the ALJ did not err with respect to Stiles's mental limitations.

**B. The ALJ did not err with respect to the opinion evidence**

Stiles argues that the ALJ erred when evaluating the opinion evidence provided by consultative examiner Dr. Sioson, treating physician Dr. Levy, and treating nurse practitioner Turoczi.  Doc. 15, pp. 17-21.

23

*Dr. Sioson*:

The ALJ considered Dr. Sioson's opinion as follows:

> In the absence of a persuasive treating source opinion regarding the claimant's physical functioning as a whole, the undersigned has also considered the statement of Dr. Eugene Sioson, MD, the consulting examining physician, who opined the claimant would be capable of performing sedentary work, but with light handling and manipulation. (Exhibit 14F, p. 2). This opinion was consistent with the findings on examination, including waddling, but unassisted, gait; ability to get on and off the examination table; normal lung and chest sounds; some pain on range of motion but no tenderness of the knees; tenderness of the ankles; and ability to grasp a dynamometer, as well as handle and carry small objects.  There has been no evidence of sustained worsening of the claimant's physical impairments since this time.  Although she experienced an exacerbation of lower back pain in early 2017 secondary to a synovial cyst on the lumbar spine, this pain resolved with surgical intervention in April 2017.  As a whole, Dr. Sioson's opinion adequately considered the claimant's subjective allegations of pain with prolonged standing and walking, but remained consistent with the evidence demonstrating good response to treatment overall and retained activities of daily living.

Tr. 151.

Stiles argues that the ALJ did not state what weight he gave to Dr. Sioson's opinion. Doc. 15, p. 17.  While true, it is clear that the ALJ relied on Dr. Sioson's opinion, and the ALJ's failure to express the amount of weight given to it was not error.  *See Pasco v. Comm'r of Soc. Sec.*, 137 Fed. App'x 828, 839 (6th Cir. 2005) (the ALJ's failure to even mention a consultative examiner's opinion was not error, as the examiner was not a treating source, citing *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)).

Next, Stiles asserts that Dr. Sioson's opinion was based on a "one day snapshot" and took place five months before her lumbar hemilaminectomy.  Doc. 15, p. 18.  But the ALJ acknowledged that Dr. Sioson's exam took place prior to the exacerbation of her back pain and her resultant lumbar surgery, which resolved her symptoms.  And the fact that Dr. Sioson examined Stiles once does not prohibit the ALJ from deferring to his opinion.  *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 274 (6th Cir. 2015) (the ALJ may provide greater

24

weight to even non-examining state agency physician opinions when the physician's finding and rationale are supported by evidence in the record, citing 20 C.F.R. § 404.1527).  Stiles objects that the ALJ "took it upon herself" to state that Stiles's lumber impairment responded very well to surgical intervention and failed to cite any exhibits of statements from treating providers.  Doc. 15, p. 18.  To the contrary, the ALJ cited the surgeon's follow-up treatment notes to support her statement that Stiles's lumbar impairment responded very well to surgical intervention.  Tr. 149 (citing Dr. McLain's records indicating "complete resolution of [Stiles's] preoperative radiculopathy and [that she] was back to light daily activities with no pain"; Dr. McLain's description of Stiles's surgery as an "'excellent' result"; and noting that Dr. McLain provided no functional restrictions).

Finally, Stiles contends that the ALJ's reliance upon the state agency reviewers' opinions was error because those opinions were based on an incomplete record.  Doc. 15, pp. 18-20.  But the ALJ discussed the evidence that post-dated those opinions, Tr. 145-146, 149-150, so Stiles has not described an error.  *See McGrew v. Comm'r of Soc. Sec.*, 343 Fed. Appx. 26, 32 (6th Cir. 2009) (an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error when the ALJ considered the evidence that developed after the issuance of those opinions).

*Dr. Levy*:

Stiles argues that the ALJ erred with respect to Dr. Levy's opinion.  Doc. 15, p. 19.  The ALJ explained,

> The claimant's treating orthopedic surgeon, Matthew Levy, MD, completed a checklist form on January 29, 2018, regarding the claimant's work-related physical limitations. The physician treated the claimant since prior to the alleged onset date for her ankle-related issues, and continued to monitor these conditions at routine intervals during the relevant period.  Dr. Levy opined the claimant would be capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing or walking up to two hours of

an eight-hour workday, and sitting up to four hours of an eight-hour workday.  He opined that she could "rarely" perform most postural activities including stooping, crouching, kneeling, and crawling.  The physician indicated that she could perform frequent reaching, as well as frequent gross and fine manipulation.  He opined that the claimant would require "one hour" of additional rest time during an average day…. This treating source opinion is not entitled to controlling weight, for several reasons.  Instead of providing specific objective findings to support the above limitations on sitting, postural activities, and the need for additional rest periods, the physician simply stated the claimant's diagnoses and her related treatment.  He did not explain how these related to the limitation or explain her response to the treatments he described.  Further, this opinion referenced the claimant's lumbar spine pain with respect to her limits on sitting, standing, and walking, but as explained above, this impairment responded very well to surgical intervention in April 2017.  There was no evidence to support that the impairments described in Dr. Levy's assessment resulted in pain or other symptoms that would take the claimant off-task for an additional unscheduled hour throughout a regular workday.  As noted above, these chronic impairments existed prior to the alleged onset date, some for several years, and the claimant had worked with them in her sedentary position until the onset of her acute skin infections that le[]d to her losing that position.  As a whole, Dr. Levy's opinion represents an overstatement of the claimant's impairment-related limitations, and therefore is entitled to little weight.

Tr. 151.  Stiles has not identified an error with respect to the ALJ's treatment of Dr. Levy's opinion.  She states that Dr. Levy is a treating physician (Doc. 15, p. 19), but the ALJ acknowledged that Dr. Levy was Stiles' treating physician.  She asserts that Dr. Levy was the only physician to provide an opinion after her updated MRI and subsequent lumbar surgery, a fact the ALJ also acknowledged.  Stiles submits that Dr. Levy did, contrary to the ALJ's finding, reference her "multiple injuries and multiple surgeries" as the cause of her "constant pain" and "severely limited" mobility.  Doc. 15, p. 19.  The Court disagrees: the ALJ accurately characterized Dr. Levy's support for his assessed limitations as referencing Stiles's diagnoses and her related treatment.  Tr. 1246-1247.

*Nurse Practitioner Turoczi*:

Stiles argues that the ALJ assumed the role of a physician in interpreting nurse practitioner Turoczi's opinion when she stated that Stiles's mental health treatment "failed to establish any material change in her ability to carry out the demands of work-related mental

activity." Doc. 15, p. 20.  To recap, Turoczi found Stiles to have a marked limitation in her ability to sustain an ordinary routine and regular attendance at work and an extreme limitation in her ability to work a full day without needing more than the usual rest periods.  Tr. 1452.  As discussed above, the ALJ commented that, to the contrary, the record showed that Stiles had routine, conservative care, and that her symptoms were exacerbated by situational stressors, namely her cancer diagnosis and treatment, a temporary condition.  Tr. 146.

As an initial matter, Stiles defines Turoczi's opinion as a "treating source opinion," but Turoczi is a nurse practitioner and her opinion is not a "treating source opinion" as that term is defined by the regulations.  *See Noto v. Comm'r of Soc. Sec.*, 632 Fed. App'x 243, 248–49 (6th Cir. 2015)("[N]urse practitioners, therapists, and the like are 'non-acceptable medical sources'…The opinion of a 'non-acceptable medical source' is not entitled to any particular weight or deference—the ALJ has discretion to assign it any weight he feels appropriate based on the evidence of record.") (citations omitted).

Next, in finding that Stiles's mental health treatment failed to establish any material change in her ability to carry out the demands of work-related mental activity, the ALJ was not assuming the role of a physician.  Just because Stiles began treatment does not mean that she experienced a worsening of her condition such that she could no longer perform work-related activities.  Indeed, her exam findings regularly found her to have a normal appearance, attitude, eye contact, speech, language, thought processes, fund of knowledge, attention, concentration, memory, judgment, and insight.  See, e.g., Tr. 1118-19, 1124, 1131, 1182-83, 1190-91, 1417-18, 1424-25, 1539-40.  She was found to having generally normal exam findings at her consultative exam, too, prior to starting treatment.  Tr. 799-800.  Her treatment notes stated that she made progress and, ultimately, she was stable on her medications.  See, e.g., Tr. 1075, 1080, 1084,

1092, 1146, 1169, 1178, 1394, 1406, 1420, 1427, 1502, 1523, 1528, 1533, 1541.  She was found to have a depressed mood and anxious feelings at times, which the ALJ noted.  Tr. 145.  Finally, the ALJ's observation that the treatment notes indicate that Stiles's increased symptoms were largely due to situational stressors, such as Stiles's temporary cancer diagnosis and treatment, is borne out by the record.  Tr. 144.  The ALJ's conclusion regarding Turoczi's opinion was not erroneous.

### C. Stiles is not entitled to a remand based on new evidence

Stiles asserts that, following the ALJ's decision in October 2018, she submitted new and material evidence to the Appeals Council that warrants a remand for further consideration.  Doc. 15, p. 21.  For the reasons explained below, the Court disagrees.

#### 1. New evidence submitted to the Appeals Council

On August 2, 2018, Stiles returned to Dr. Levy for a cortisone injection in her right knee and low back trigger.  Tr. 108, 111.  Dr. Levy wrote, "She is almost done with targeted therapy, and is actually feeling okay."  Tr. 108.  She denied joint swelling, cramps and weakness; numbness, tingling, and loss of balance; and depression and anxiety.  Tr. 110.  Upon exam, a limp was noted.  Tr. 111.  Dr. Levy assessed osteoarthritis of her right knee.  Tr. 111.

On October 8, 2018, Stiles saw Dr. Levy for problems with her left foot.  Tr. 104.  She reported pain that comes and goes and made ambulating difficult.  Tr. 104.  She also asked about Visco supplementation (a hyaluronic acid joint injection) for her right knee.  Tr. 104.  Upon exam, she had crepitus in her right knee, an antalgic gait, and pain to palpation in her left ankle.  Tr. 107.  Dr. Levy assessed osteoarthritis of her right knee.  Tr. 107.  A foot x-ray was taken and, compared to a 2017 x-ray, it showed "unchanged postoperative appearance of the left foot."  Tr. 103.

On October 31, 2018, Stiles had an MRI of her cervical spine that showed multi-level degenerative changes, most pronounced at C4-5 through C6-7, in which there was severe left sided neural foraminal stenosis and spinal cord compression at C4-5 and C6-7.  Tr. 33-34, 38-39. At a follow-up with Dr. McLain on November 8, Stiles reported that her thoracic and cervical spine pain were severe; the range of motion in her cervical spine "continue[d] to deteriorate"; when she held her head in an extended position to look straight ahead she was beginning to get numbness and tingling in her left arm; and she had experienced significant left arm pain and numbness over the last two weeks.  Tr. 35.  Upon exam, her range of motion was impaired and she appeared uncomfortable sitting in an upright position.  Tr. 38.  She tended to slump backwards in order to hold her head slightly flexed during her visit.  Tr. 38.  Range of motion reproduced pain into her left shoulder.  Tr. 38.  Her balance and gait were normal.  Tr. 38.  Dr. McLain commented that her radicular symptoms were becoming more prominent and prescribed physical therapy while opining that it was likely Stiles would need a discectomy and spinal cord decompression.  Tr. 39.

On April 17, 2019, Stiles saw Dr. Levy to pick up a prescription and reported "the usual amount of hip/back pain."  Tr. 113.  Upon exam, her hip was normal other than mostly posterior tenderness and she had an antalgic gait.  Tr. 115.  Dr. Levy went over her right hip x-ray from March 2019, which showed mild degenerative changes, and assessed right hip pain.  Tr. 116, 117.

On May 7, 2019, Dr. McLain performed surgery on Stiles's cervical spine.  Tr. 44-47.

On August 12, 2019, Stiles received trigger point injections in her low back; Dr. Levy noted that it had "been awhile" since she had had one and that her pain had recently been increasing in severity.  Tr. 70.  Dr. Levy assessed lumbosacral spondylosis.  Tr. 73.  He also

initiated Visco supplementation for her right knee.  Tr. 65.

### 2. Law and analysis

Sentence six of 42 U.S.C. § 405(g) allows a court to remand to the agency to develop additional evidence in the record, "but only upon a showing that there is new evidence which is material and that there is good cause for failure to incorporate such evidence into the record in a prior proceeding." *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007) (quoting § 405(g)); *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  In a sentence six remand, the plaintiff has the burden to demonstrate that the evidence she now presents in support of a remand is "new" and "material" and that there was "good cause" for her failure to present it in the prior proceedings.  *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006); *see also Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010) (although the evidence that the claimant sought to introduce was "new," the claimant failed to meet her burden  of showing "good cause" for failure to submit it and that the evidence was "material.").  Evidence is new "only if it was not in existence or available to the claimant at the time of the administrative proceeding"; material "only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence"; and a claimant shows good cause "by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ."  *Id.* (quoting *Foster*, 279 F.3d at 357 (internal quotations omitted)).  A sentence six remand is not appropriate to consider evidence that a claimant's condition worsened after the administrative hearing.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 753 (N.D. Ohio Jan. 18, 2011) (citing *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992)).

Here, the evidence Stiles submitted to the Appeals Council regarding her knee, hip, and

low back impairments are not material.  Rather, it is merely cumulative of her condition and treatment already considered by the ALJ.  Indeed, Stiles received knee, hip, and low back injections regularly throughout the relevant period.  E.g., Tr. 174-175.  She was noted to walk with a limp.  E.g., Tr. 1280, 1474.  Her foot x-ray taken after the hearing but before the ALJ's decision showed no change from a prior x-ray in 2017.  Tr. 103.  Therefore, there is no reasonable probability that the ALJ would have reached a different disposition of Stiles's disability claim if presented with the new evidence.  *See Ferguson*, 628 F.3d at 276.

Nor is Stiles entitled to a remand based on her evidence regarding her cervical spine MRI and subsequent surgery.  Stiles does not show good cause for her failure to present the evidence in the prior proceedings.  *Id*.  The ALJ remarked that the evidence in the record did not show that Stiles complained of neck pain "at a frequency or severity that would have reasonably interfered with her ability to sit for prolonged periods."  Tr. 149.  Indeed, in her brief, Stiles only cites two doctor visits during the relevant period in which she complained of neck pain.  Doc. 15, pp. 4, 5. And, as the ALJ noted, she regularly drove between Cleveland and Pittsburgh (which required using her upper arms and holding her head up) and there was no evidence of a worsening cervical spine condition.  Tr. 149.  Stiles does not explain why she did not report or seek treatment for neck pain during the relevant period if it was as severe as she now alleges.  Thus, she has not shown good cause for failing to acquire and present imaging of her cervical spine during the relevant period.  *Ferguson*, 628 F.3d at 276 (a claimant shows good cause "by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ.").

Finally, the new evidence regarding Stiles's neck impairment shows a worsening condition.  Only on November 8, 2018, did Stiles report severe cervical spine pain.  Her range of

31

motion had deteriorated, and for the last two weeks she had experienced significant left arm pain and numbness.  Tr. 35.  Upon exam, her range of motion was impaired and she appeared uncomfortable sitting in an upright position, tending to slump backwards in order to hold her head slightly flexed.  Tr. 38.  Those were new physical exam findings.  If Stiles's condition worsened after the administrative hearing, the appropriate remedy would be to initiate a new claim for benefits as of the date that her condition rose to the level of a disabling impairment. *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988).  Indeed, that appears to have been the case, as Stiles states that she filed a new claim and was found disabled beginning the day after the ALJ's decision, October 20, 2018.  Doc. 15, pp. 10-11.

In sum, Stiles is not entitled to a sentence six remand.

### VII. Conclusion

For the reasons set forth herein, the Commissioner's decision **AFFIRMED**.


IT IS SO ORDERED.


Dated: November 23, 2020                      */s/Kathleen B. Burke*
                                                    Kathleen B. Burke
                                                    United States Magistrate Judge